UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:16-cv-62935-MORENO/TURNOFF

LUIS PORTALES, MARGARITA HEINE,
and FANNY QUINTERO,

      Plaintiffs,
vs.

SCHOOL BOARD OF BROWARD
COUNTY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court upon Defendant School Board of Broward County ("School Board's") Motion for Summary Judgment **(ECF No. 25)**, and an Order of Referral entered by the Honorable Federico A. Moreno. **(ECF No. 30 )**. The Motion **(ECF No. 25)** was filed on May 3, 2017, and was referred to the undersigned on May 10, 2017. **(ECF No. 30)**. The Motion became ripe on May 24, 2017. **(ECF No. 38)**. This Court held a hearing on June 28, 2017. **(ECF No. 41)**. Upon review of the Motion, the Response, the Reply, hearing argument from counsel, and being otherwise duly advised in the premises, the undersigned makes the following findings.

### Background

This action was filed by Plaintiffs Luis Portales, Margarita Heine, and Fanny Quintero (collectively "Plaintiffs") on December 13, 2016. **(ECF No. 1)**. The Complaint alleges, among other things, disparate treatment, disparate impact and discrimination under Title VII of the Civil Rights Act of 1964. With respect to Plaintiff Quintero, the Complaint also alleges failure to accommodate. Id. By way of summary, Plaintiffs claim that the School Board's *English only*

course/testing on basic skills for its janitors has disparately impacted Hispanic janitors on its staff, and resulted in their termination. Id.

Plaintiffs, all former School Board custodians, or facilities servicepersons ("FSP[1]") performed janitorial duties for their respective schools, e.g., waxing, mopping, pressure cleaning and collecting garbage. Id. They are all Hispanic. Neither of them speak or read English fluently. Id.

*FSP Job Training/Requirements*

As a requisite of full-time employment, the School Board requires all FSPs to attend and complete mandatory training/courses, including an Asbestos Awareness course, Lock-out/Tag-out course, and Basic FSP course. **(ECF No. 27-1, Def. MSJ App. 1, Ex. A)**;( Johnson Decl. ¶ 14). The Basic FSP Course is at issue in this case. **(ECF No. 1)**. The course itself takes place over a period of five (5) days. (Johnson Decl. ¶ 18). Basically, employees attend a thirty-two (32) hour training session on "school sanitation procedures, use of chemicals and equipment, and safety on the job." Id. at ¶ 17. Thereafter, they take a one-hour examination on the final day of the course. Id. During the instruction, employees are permitted to bring an interpreter to the class to assist their understanding of the course, which is taught exclusively in English; however, during the final exam, employees are prohibited from using interpreters, dictionaries, or any other aids. Id. at ¶ 21. The exam, like the class, is available only in English.

During the course of their employment, in June 2015, the School Board notified Plaintiffs that they had to complete this mandatory training. **(ECF No. 1)**. During the training, Plaintiffs

---

[1] Portales worked as an FSP at Gator Run Elementary School in Weston, Florida. Id. Quintero worked as an FSP at Eagle Point Elementary School in Weston, Florida. Id. Heine worked as an FSP at Ft. Lauderdale High School in Ft. Lauderdale, Florida. Id.

2

asked that they be instructed in Spanish. According to the Complaint, Portales asked HR for assistance. HR requested that Terrence Johnson ("Johnson"), the trainer/coordinator for the FSP program, show Plaintiffs an instructional video in Spanish in order to assist in their preparation. **(ECF No. 1)**. Plaintiffs allege that Johnson refused and made discriminatory remarks, e.g., "If you don't speak English, you cannot work for the School Board," and "[If they don't speak] English, they should stay home!" Id. Plaintiffs further allege that Johnson refused to answer any of their questions during the training sessions. Id.

Despite their request to be tested in Spanish, the School Board administered the test to all Plaintiffs in English. Id. None of them were able to achieve a passing score. As a result, they were terminated. This action followed. The School Board now seeks the entry of Summary Judgment in its favor.

## Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility to inform the court of the basis for its motion and identify the portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thereafter, to overcome summary judgment, the nonmovant must "go beyond the pleadings" and set forth "specific" material facts that remain in dispute. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In so doing, the Court should view all evidence and make all justifiable inferences in favor of the non-moving party. Id. However, if the evidence proffered by the nonmovant is "merely colorable" or "not significantly probative," summary judgment may still be granted. Id. at 249-250.

### Analysis

*Title VII Discrimination Claims*

Title VII of the Civil Rights Act of 1964, and subsequent relevant case law, distinguish between two types of discrimination claims: disparate treatment and disparate impact claims. EEOC v. Catastrophe Mgmt. Solutions, 852 F.3d 1018, 1024 (11th Cir. 2016). These two theories "are not interchangeable, and 'courts must be careful to distinguish between the[m].'" Id. In a disparate treatment claim, an employee must demonstrate that the employer intentionally discriminated against her on the basis of a protected characteristic. Id. By contrast, a claim of disparate impact does not require intent. Id. Rather, it "targets an employment practice that has an actual, though not necessarily deliberate, adverse impact on protected groups." Id. In other words, "[a] disparate impact claim requires the identification of a specific, facially neutral, employment practice causally responsible for an identified statistical disparity." E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1268 (11th Cir. 2000). Plaintiffs herein are proceeding under both theories.

The School Board, on the other hand, argues that both claims fail because, among other things, speaking only Spanish is not a protected category under Title VII and, even if it were, Plaintiffs have failed to present evidence of discrimination. The undersigned agrees.

*1. Disparate Treatment Claim*

Under a theory of disparate treatment, an employer may be found liable for intentional

4

discrimination against an individual on the basis of a characteristic protected by Title VII. The key factor is the employer's intent. To prevail on a disparate treatment claim, the initial burden falls upon the plaintiff to present direct or circumstantial evidence. Direct evidence is evidence that, if believed, proves the existence of a fact without inference or presumption. Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir.1987)(quoting Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987)).

Absent same, a plaintiff can establish her *prima facie* case by way of circumstantial evidence, which requires a showing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated less favorably than similarly-situated individuals outside her protected class. Maynard v. Board of Regents of the Division of Universities of the Fla. Dept. of Education, 342 F.3d 1281, 1289 (11th Cir. 2003). Each one must be met. Id. "Demonstrating [these elements] creates an inference that the employer acted with discriminatory intent." Sheppard v. Sears, Roebuck, & Co., 391 F.Supp.2d 1168 (S.D. Fla. 2005).

Thereafter, to rebut this inference, the employer must proffer a legitimate, non-discriminatory reason for its action or policy. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973). If it succeeds, the plaintiff is again charged with demonstrating, by a preponderance of the evidence, that the reason asserted by the employer is a mere pretext. Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir.2002). In so doing, the plaintiff "must meet [the proffered] reason head on and rebut it, and the [plaintiff] cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000).

As noted *supra*, Plaintiffs claim that Johnson made discriminatory comments against

Hispanics, which amounts to direct evidence of discrimination. To this end, Plaintiffs' consistently testified as to the nature of the remarks:

> A: On that occasion he said that he could not speak with me, because I didn't speak English. And on another occasion when I also went there, I don't remember what I went to ask of him, he said to me, How was it possible that I was working at the school Board if I did not speak English? And that was told to me by my friend who was sitting down, but he heard.
>
> Q: So did he say, How is it that you're working at the School Board when you don't speak English or did he say, if you do not speak English, you cannot work for the School Board?
>
> A: No. How is it possible that I work at the School Board if I don't speak English? And he said it out loud, because those who speak English started to laugh.

(Portales Dep. 100:10-23).

> I went with my husband to where he was because we had already passed an exam and we were going to ask him to see how we could find out about our scores. And then he said to us, If you don't know English, what are you doing here? Go home.

(Quintero Dep. 58:14-18).

These statements may, no doubt, be construed as insensitive. However, as discussed *supra*, they fail to rise to the level of direct evidence, because they would require an inference. In other words, they demonstrate only that Johnson questioned the possibility that the Plaintiffs' worked at the School Board without speaking English, and not that Johnson intended to terminate their employment because of their native language. Having found no direct evidence, the undersigned shall now address whether Plaintiffs have made a sufficient showing as to circumstantial evidence.

After applying the requisite factors, the undersigned finds that Plaintiffs did suffer an adverse employment action when they were terminated. Thus, the following questions remain: (1) whether

6

they are members of a protected class, i.e., Spanish speakers or non-English speakers; (2) whether they are qualified for the FSP position; and (3) whether Plaintiffs were treated less favorably than individuals outside of their protected class, i.e., English speakers.

*Are Plaintiffs Members of Protected Class Under Title VII?*

Here, Plaintiffs allege that they were discriminated against on the basis of their ability to speak only Spanish, which, by proxy, is discrimination on the basis of their national origin. Thus, they contend that they are protected by Title VII.

Title VII prohibits discrimination on the basis of an "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Importantly, "[s]ave for religion, the discriminations on which the Act focuses its laser of prohibition are those that are either beyond the victim's power to alter, . . . or that impose a burden on an employee on one of the prohibited bases." Garcia v. Gloor, 618 F.2d 264, 269 (5th Cir. 1980). In other words, the Act protects an individual's "immutable" characteristics. Id. "Once a status is ascribed, it is 'immutable' in the pragmatic sense that the individual cannot readily alter it." E.E.O.C. v. Catastrophe Mgmt. Solutions, 852 F.3d 1018 (11th. Cir. 2016). For example, in Catastrophe Mgmt. Solutions, the Eleventh Circuit found that an employer's policy prohibiting its employees from wearing their hair in dreadlocks did not constitute discrimination on the basis of race. There, the employee claimed that dreadlocks are a racial characteristic because they "are a manner of wearing the hair that is physiologically and culturally associated with people of African descent." Id. The Court disagreed and made a distinction between "discrimination on the basis of black hair texture," such as a natural Afro, and "adverse action on the basis of black hairstyle," such as an "all-braided hairstyle." Id. (comparing Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 168 (7th Cir. 1976) with, Rogers v. Am. Airlines, Inc., 527

7

F.Supp. 229 (S.D.N.Y. 1981)). The former, the Court noted, was an immutable characteristic, while the latter was a "product of artifice." Id.

There does not appear to be an abundance of case law that specifically addressees the circumstances involved herein. However, some courts in this Circuit have generally suggested that the inability to speak a certain language, without more, is not protected. See e.g., Miliazzo v. Title Cash of Huntsville, No. 2:11-CV-1858-AKK, 2012 Wl 5263584, at *4 (N.D. Ala. Oct. 23, 2012)(granting summary judgment for Defendant finding that the inability to speak Spanish – in the State of Alabama – was not protected under Title VII); Davis v. Infinity Ins. Co., No. 2:15-CV-0111-JHE, 2016 WL 4507122, at *5 (N.D. Ala. Aug. 29, 2016). Although not exactly on point, the pre-split (5th Circuit) decision in Garcia v. Gloor is instructive, because it examined the scope of the Act's protection in the context of language. There, a bilingual employee challenged his employer's policy, which "prohibit[ed] employees from speaking Spanish on the job unless they were communicating with Spanish-speaking customers." Id. The employee, who spoke both English and Spanish, claimed that the policy was discriminatory on the basis of national origin because it was likely to be violated only by Hispanic-Americans. Id. While the Court held that the English-only rule was not discriminatory in this context, it emphasized the narrow scope of its holding:

> Our opinion does not impress a judicial imprimatur on all employment rules that require an employee to use or forbid him from using a language spoken by him at home or by his forebears. We hold only that an employer's rule forbidding a bilingual employee to speak anything but English in public areas while on the job is not discrimination based on national origin as applied to a person who is fully capable of speaking English and chooses not to do so in deliberate disregard of his employer's rule.

Id.

There, the Court's decision appears to have turned on the employee's ability to speak

8

both languages. Id. Here, Plaintiffs did not deliberately disregard their employer's policy, nor do they merely "prefer" or "choose" to speak Spanish over English, as in Garcia. See id. Rather, Plaintiffs here *cannot* speak, read, or write English fluently. All three Plaintiffs' required a Spanish/English interpreter for their respective depositions, and they likewise testified that they could not read or write English. (Portales dep. 91:3-10; 91:18-92:10). Plaintiffs herein, all monolingual, specifically testified that they had attempted to learn English at different times, but were unable to do so:

> Q: What steps have you ever taken to try to learn English?
> A: Sometimes I would like to learn it, but sometimes I can't retain it. I just can't. It's very difficult.
> Q: So you have tried to learn English?
> A: Sometimes I read a dictionary at home, but no, no.
> Q: You have a dictionary at home?
> A: A little one.
> Q: Is it a Spanish-English dictionary?
> A: Yes
> Q: And other than reading the Spanish-English dictionary, what other efforts have you made to try to learn English?
> A: Sometimes my husband plays a CD, but no.
> Q: So your husband plays a CD and you listen while he's studying it?
> A: Yes. Sometimes he plays a CD and I listen to it, but I can't retain it.

(Quintero Dep. 28:13-29:6).

> Q: So you took an English class at Piper in Broward County?
> A: Yes.
> Q: Is that a high school?
> A: Yes, it's a high school.
> Q: How long was the class?
> A: Perhaps two or three months. I don't remember.
> Q: Did you attend the entire class?
> A: No.
> Q: When did you start that class?
> A: When I had just arrived in Florida.
> Q: Why didn't you complete the class?
> A: Because we had just arrived, we had small children, I had to stay with the

9

children, I had to work; they paid us very little. I didn't have time then to go study.

(Heine Dep. 49:6-20).

Although distinguished above, ceratin *dicta* from Garcia is actually quite instructive here. Again, Garcia was decided in the context of a bilingual plaintiff. Interestingly, however, the Court provides an insight as to its views on facts more akin to those in this case,

> [The] Act does not support an interpretation that equates the language an employee prefers to use with his national origin. *To a person who speaks only one tongue* or to a person who has difficulty using another language than the one spoken in his home, *language might well be an immutable characteristic like skin color, sex or place of birth.*

Garcia v. Gloor, 618 F.2d 264, 270 (5th Cir. 1980)(emphasis added).

Applying that reasoning to our circumstances here, Plaintiffs' only spoken language *may* well be an immutable characteristic. Unfortunately for Plaintiffs, however, such a finding will not change the result here. In other words, even assuming that the protections of Title VII apply, Plaintiffs' claims nonetheless fail.

*Are Plaintiffs qualified for the FSP position?*

As noted above, had Plaintiffs established a *prima facie* case, proceeding under a theory of circumstantial evidence, the burden shifting analysis of the McDonnell Douglas framework would come into play. Again, once a plaintiff establishes a *prima facie* case, the burden shifts to the Defendant to show a legitimate, non discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 792. The defendant/employer need only show that the reason existed and was legitimate. Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir.2007 ).

Here, the School Board contends that Plaintiffs were not qualified for the FSP position because, among other things, the position requires that employees pass the course and exam at issue

10

as a condition of their employment. **(ECF No. 25)**. Specifically, pursuant to a collective bargaining agreement, all newly hired and currently employed facilities service personnel, including FSP, are required to attend and complete Mandatory In-Service Training which includes the Asbestos Awareness course, the Lock-out/Tag-out course, and the Basic FSP course. **(ECF No. 27-1, MSJ App. 1, Ex. A)**.

Along these same lines, the FSP job description required that the custodians be able to follow written and oral instructions– all of which are in English – on cleaning and the operation of equipment.

> Able to perform custodial work. Ability to operate labor saving devices such as shampoo and scrubbing machines, wet and dry vacuums, plus other heavy labor saving devices in the schools. Ability to do heavy lifting, climb ladders to replace light bulbs and filters from air conditioning equipment. *Must be able to follow written and oral instructions on cleaning and equipment operation.* Able to work well with others.

**(ECF No. 27-1, MSJ App. 1, Ex. A)**. (emphasis added).

Because it is undisputed that none of the Plaintiffs were able to meet these requirements, it logically follows that they were not entitled to remain employed as FSP. **(ECF No. 25)**. Again, the record reflects that each Plaintiff failed the FSP course/exam on multiple occasions. Portales failed the BSP at least ten (10) times, and was a no-show for one of the exams. **(ECF No. 27-1, p. 147-148)**. Heine failed four (4) times. **Id. at 149.** Quintero failed approximately eight (8) times and failed to show up for three other test administrations. Id. at 146. That was the basis for their termination. In other words, the School Board has offered its non-discriminatory reason for the terminations. Plaintiffs have failed to show evidence of pretext. Having articulated a clear and

11

non-discriminatory basis for its actions, the School Board has met its burden.

It also bears noting, as raised by the School Board, that English is the official language of the State of Florida. The School Board, the State of Florida and the federal government all conduct business in English. **(ECF No. 25)** (citing, e.g. Fla. Const. art. II, § 9). Therefore, it follows that the School Board conduct its training and testing in English. Importantly, requiring the provision of training and testing in Spanish, would necessarily require the same accommodation for employees in South Florida's diverse workforce who speak other languages, e.g. Creole, and many others. In this Court's view, such a requirement would create a burden on the School Board beyond what was envisioned by the drafters of the statute.

*Were Plaintiffs Treated less Favorably than Employees Outside of the Presumptive Protected class?*

Lastly, Plaintiffs would have had to show that they were treated less favorably than similarly situated individuals outside of their protected class. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). In so doing, "the plaintiff [s] must [have] show[n] that [they] and the [comparator] employees are similarly situated in all relevant respects." Id. In this connection, "it is necessary [for the court] to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Id. (citing Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir.)). In Maniccia v. Brown, for example, the employee, a deputy sheriff, was terminated following her violation of four distinct department policies. 171 F.3d 1364, 1366 (11th Cir. 1999). The employee filed a disparate treatment claim alleging that three male employees, who committed similar violations were disciplined less severely. Id. at 1369. However, the court found

12

that the male officers were easily distinguishable, because "[e]ach of [the] male officers was involved in a single incident of misconduct or alleged misconduct, whereas [the plaintiff] committed at least four policy violations." Id. There, the court granted summary judgment in favor of the employer – finding that the employee failed to establish her *prima facie* case.

Here, a similarly situated employee would necessarily be a non-Hispanic individual who, like the instant Plaintiffs, failed the FSP exam. See Holified, 115 F.3d at 1562; see also Maniccia, 171 F.3d at 1368 ("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."). Here, however, Plaintiffs have failed to identify *any* individuals who failed the FSP exam but were not terminated from their employment. In fact, the record shows that other FSPs who failed the exam were likewise subjected to dismissal, regardless or their national origin. **(ECF No. 27-1; 27-27 )**. For example, the following individuals, all non-Hispanics, were terminated between October -November 2015 for failing to complete/pass the FSP course/exam: Joseph Caruso, Corey Holender, Ricardo Maignan, Leon Pinkney, Leaford Bernard and Anthony Jones. **(ECF No. 27-27)**.

Again, the record unequivocally shows that the FSP job description requires that employees "complete the [course and program] . . . and receive a Basic Facilities Service certification within the probationary period of employment." **(ECF No. 27-1)**. Moreover, Terrance Johnson, the School Board's coordinator[2] for the FSP Program, confirmed that "[b]egining in May 2014, successful

---

[2]Johnson did not have the authority to hire or fire FSP personnel. (Johnson Aff. ¶ 7 ). The hiring/firing of FSP could only be accomplished by the principal/administrator at each

completion of the Basic FSP course was required of all Facilities Servicepersons within 131 days of initial hire date. Prior to May 2014, the time to complete the Basic FSP course was two years." (Johnson Aff. ¶ 24). In sum, the course and exam passage are both requirements of employment. Plaintiffs have failed to proffer evidence that the School Board enforced this policy unequally. Simply put, because they were unable to obtain passing scores, they were no longer qualified for their respective positions. Consistent with the above, Plaintiffs' disparate treatment claim must fail.

*2. Disparate Impact Claim*

"In contrast [to disparate treatment claims], disparate impact theory prohibits *neutral* employment practices which, while non-discriminatory on their face, [result in] an adverse, disproportionate impact on a statutorily-protected group." E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263 (2000) (citing Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971) (emphasis in original). "The doctrine seeks the removal of employment obstacles, not required by business necessity, which create 'built-in headwinds' and freeze out protected groups from job opportunities and advancement." Id. (citations omitted)

"The disparate impact framework under Title VII by now is well-settled." Joe's Stone Crab, Inc., 220 F.3d at 1274. To make out a *prima facie* case, the plaintiff must "isolate and identify 'the specific employment practices'" that have a "disproportionately adverse impact on the members of a protected group." MacPherson v. Univ. of Montevallo, 922 F.2d 766, 771 (11th Cir. 1991). Importantly, causation is a key component of the plaintiff's *prima facie* case. Stated differently, a

---

respective school. (Johnson Aff. ¶ 6).

plaintiff may prove a *prima facie* case of disparate impact discrimination using a two step process: "[f]irst the plaintiff must identify the specific employment practice that allegedly has a disproportionate impact. Second, the plaintiff must demonstrate causation by offering statistical evidence sufficient to show that the challenged practice has resulted in prohibited discrimination." Pouyeh v. Bascom Palmer Eye Inst., 613 F. App'x 802, 810 (11th Cir. 2015); see also Joe's Stone Crab, Inc., 220 F.3d at 1263. Once the plaintiff meets this initial burden, the defendant is charged with establishing that the challenged practice serves a legitimate, non discriminatory business objective. Joe's Stone Crab, Inc., 220 F.2d at 1275. Then, "if the defendant satisfies this burden, a plaintiff may still prevail by proving that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." Id.

By way of example, in Griggs, the Supreme Court examined an employer's policy regarding employee hiring and transfers amongst the company's five departments. 401 U.S. at 431 Significantly, prior to the implementation of Title VII, "the Company openly discriminated on the basis of race" by employing African American employees only in its labor department, the lowest-paying department in the company. Id. at 426-27. The day that Title VII became effective, the company abandoned its openly discriminatory policies. In its place, it required that employees pass two aptitude tests in order to work in any department other than labor. Id. It also began requiring a high school education to be eligible for transfer from the labor department. Id. Notably, neither prerequisite "[was] shown to bear a demonstrable relationship to successful performance of the jobs for which it [was] used." Id. Ultimately, while "there was no showing of a racial purpose or

invidious intent," the Supreme Court found the policy to be a violation of Title VII because "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." Id. Accordingly, because the employment practice could not "be shown to be related to job performance, the practice was prohibited." Id.

Plaintiffs herein have identified a "specific employment practice," i.e., the requirement that employees pass an exam, which is provided only in English, without the assistance of outside resources, such as translation dictionaries. The policy is facially neutral, as it does not target a specific, protected class and it is enforced equally against all FSP employees of the School Board. Thus, the issue becomes whether enforcement of the policy has a disparate impact on members of Plaintiffs' protected class, i.e., Spanish-speakers. Plaintiffs' have failed to prove that it does.

Here, Plaintiffs contend that "there is actual evidence not speculative evidence [sic] of disparate impact on Hispanic [j]anitors in this case." **(ECF No. 35)**. In support of this statement, Plaintiffs provide a chart, which purports to demonstrate a statistical disparity between the percentage of Hispanic and percentage of non-Hispanic FSP exam-takers who fail the exam. This chart appears to be the crux of Plaintiffs' disparate impact argument. However, the Court finds it unhelpful and confusing.

For example, in the column titled, "PERCENTAGE of Non-Hispanic vs. Hispanics who Fail," Plaintiffs write "17% FAIL." **(ECF No. 35)**. In the adjacent column, entitled "PERCENTAGE of Non-Hispanics who Pass," Plaintiffs write "70% PASS." (Id.) First, the undersigned is unable to identify the intended meaning of "Percentage of Non-Hispanic vs.

16

Hispanics who fail"; however, even if the Court proceeds by assuming this to be a "typo," and assuming the column to mean "percentage of Non-Hispanics who fail," the numbers simply do not add up. Presumably, Non-Hispanics who take the exam must either (1) pass or (2) fail. Thus, the percentage of Non-Hispanics who pass the exam plus the percentage of Non-Hispanics who fail the exam should equate to 100%. According to Plaintiffs' numbers, however, this number equals 87% (17% fail and 70% pass). Further, the School Board has presented viable support for the proposition that there is no statistical disparity in the number of Hispanic persons employed as FSP when viewed alongside the population of Broward County as a whole. See **(ECF No. 25; 27-7)**.

Again, even if Plaintiffs had met their burden of showing the existence of a statistical disparity, they remain unable to refute the proffered legitimate non-discriminatory objective offered by the School Board. Applying the law to the facts of this case, the undersigned finds that Plaintiffs have failed to meet their burden.

*Plaintiff Quintero's Failure to Accommodate Claim*

As indicated above, Quintero claims that the School Board failed to accommodate her alleged learning disabilities. However, as discussed *infra*, Quintero must first establish that she is disabled within the meaning of the Americans with Disabilities Act in order to be afforded its protections. For the reasons stated below, the undersigned finds that she has failed to do so, and, thus, summary judgment is appropriate as to her claim.

Under the Americans with Disabilities Act (ADA), an employer shall not discriminate against "a qualified individual with a disability" on the basis of such individual's disability. 42

17

U.S.C. § 12112(a). The Act defines the term "qualified individual with a disability" to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment condition that such individual holds or desires." Hilburn v. Murata Electronics N. America, Inc., 181 F.3d 1220, 1226 (11th Cir. 1999) (citing 42 U.S.C. § 12111(8)). A plaintiff is disabled within the meaning of the ADA if: (1) she has a physical or mental impairment which substantially limits one or more major life activities; (2) she has a record of the alleged impairment; or (3) she is regarded as having such an impairment, regardless of whether she is actually disabled. Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 507 F.3d 1306, 1310-11 (11th Cir. 2001) (citing 42 U.S.C. § 12102(2)). Once an employee establishes that she is a qualified disabled individual within the meaning of the Act, the ADA "imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in an undue hardship to the employer." Morisky v. Broward County, 80 F.3d 445, (11th Cir. 1996) (citing 42 U.S.C. § 12112(b)(5)(A)).

Here, Quintero alleges that she is a "slow learner" and she has "problems reading and writing in Spanish and English." **(ECF No. 1)**. However, beyond these allegations, the record is devoid of any documented disability. In fact, Quintero herself admitted to never having seen a medical professional for a diagnosis on any of these alleged disabilities. Quintero Depo. at 34-36; 65. Simply put, her self-serving claims of having learning problems, without more, are insufficient to trigger the protections of the ADA. Morisky, 80 F. 3d at 448.

Consistent with the above and foregoing, it is hereby **RESPECTFULLY**

**RECOMMENDED** that the School Board's Motion for Summary Judgment (**ECF No. 25**) be **GRANTED**.

Pursuant to S.D. Fla. Magistrate Rule 4(b), the parties may serve and file written objections to this Recommendation with the Honorable Federico A. Moreno, United States District Judge for the Southern District of Florida, within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file timely objections shall bar the parties from attacking on appeal any factual findings contained herein. RTC v. Hallmark Builders, Inc., 996 F.2d 1144 (11th Cir. 1993); LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida, this 9th day of August 2017.

**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc: Hon. Federico A. Moreno
Counsel of Record